# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| Gregory Stark, William Gaff, and Michael Lewin, individually and as representatives of a class of similarly situated persons, and on behalf of the KeyCorp 401(k) Savings Plan,<br><br>Plaintiffs,<br><br>v.<br><br>KeyCorp, the Trust Oversight Committee, and John Does 1-30,<br><br>Defendants. | Case No. 2:20-cv-02922<br><br>**COMPLAINT**<br><br>**CLASS ACTION** |

## NATURE OF THE ACTION

1.     Plaintiffs Gregory Stark, William Gaff, and Michael Lewin, as representatives of the Class described herein, and on behalf of the KeyCorp 401(k) Savings Plan (the "Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against Defendants KeyCorp, the Trust Oversight Committee ("Committee"), and John Does 1-30 (collectively, "Defendants"). As described herein, Defendants have breached their fiduciary duties with respect to the Plan in violation of ERISA, to the detriment of the Plan and its participants and beneficiaries. Plaintiffs bring this action to remedy this unlawful conduct and obtain appropriate monetary and equitable relief as provided by ERISA.

## PRELIMINARY STATEMENT

2.     As of September 2019, Americans had approximately $8.5 trillion in assets invested in defined contribution plans, such as 401(k) and 403(b) plans. *See* Investment Company Institute, *Retirement Assets Total $30.1 Trillion in Third Quarter 2019* (Dec. 18, 2019), *available at*

1

https://www.ici.org/research/stats/retirement/ret_19_q3. Defined contribution plans have largely replaced defined benefit plans—or pension plans—that were predominant in previous generations. *See* Bankrate, *Pensions Decline as 401(k) Plan Multiply* (July 24, 2014), *available at* http://www.bankrate.com/finance/retirement/pensions-decline-as-401-k-plans-multiply-1.aspx. Only around 8% of non-union U.S. workers in the private sector participate in a defined benefit plan. *See* Congressional Research Service, *Worker Participation in Employer-Sponsored Pensions: A Fact Sheet*, at 4 (Apr. 30, 2019) *available at* https://fas.org/sgp/crs/misc/R43439.pdf. By contrast, approximately 47% of non-union U.S. workers in the private sector participate in a defined contribution plan. *See id.*

3. The potential for disloyalty and imprudence is much greater in defined contribution plans than in defined benefit plans. In a defined benefit plan, the participant is entitled to a fixed monthly pension payment, while the employer is responsible for making sure the plan is sufficiently capitalized, and thus the employer bears all fees. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999). Therefore, in a defined benefit plan, the employer and the plan's fiduciaries have every incentive to keep costs low. But in a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015). Thus, the employer has no incentive to keep costs low because all fees are typically borne by the employee.

4. To safeguard retirement plan participants, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Chao v. Hall Holding Co.*, 285 F.3d 415, 426 (6th Cir. 2002) (quotation omitted). Fiduciaries must act "solely in the interest of the

participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope, 29 U.S.C. § 1104(a)(1)(B). This includes an obligation to ensure that expenses of administering the plan are reasonable. *See* 29 U.S.C. § 1104(a)(1)(A)(ii).

5. Contrary to these fiduciary duties, Defendants failed to monitor and control the Plan's expenses for recordkeeping and related administrative services. This has resulted in millions of dollars in excessive fees to the Plan and its participants since the beginning of the statutory period.

6. Based on the conduct described herein, Plaintiffs assert claims against Defendants under ERISA for breaches of the fiduciary duties of loyalty and prudence (Count One), and against KeyCorp for failure to monitor fiduciaries (Count Two). In connection with these claims, Plaintiffs seek to recover all losses to the Plan resulting from Defendants' fiduciary breaches and other appropriate relief.

## JURISDICTION AND VENUE

7. Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

8. This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

9. Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the Plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendants may be found.

## THE PARTIES

### PLAINTIFFS

10. Plaintiff Gregory Stark resides in Greensburg, Pennsylvania, and was a participant in the Plan in 2019. As a Plan participant, his account was recordkept by Alight Financial Advisors ("Alight")[1] during the class period.[2] Plaintiff Stark has been financially injured by Defendants' unlawful conduct, and his account would be worth more today if Defendants had not violated ERISA as described herein.

11. Plaintiff William Gaff resides in Canton, Ohio and was a participant in the Plan from approximately 2010 until 2017. As a Plan participant, his account was recordkept by Alight. Plaintiff Gaff has been financially injured by Defendants' unlawful conduct, and his account would be worth more today if Defendants had not violated ERISA as described herein.

12. Plaintiff Michael Lewin resides in Beachwood, Ohio. Plaintiff Lewin has participated in the Plan since 2018, and is a current participant in the Plan. As a Plan participant, his account is recordkept by Alight. Plaintiff Lewin has been financially injured by Defendants' unlawful conduct, and his account would be worth more today if Defendants had not violated ERISA as described herein.

### THE PLAN

13. The Plan was established by KeyCorp on January 1, 1979.

14. The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C.

---

[1] Alight is the legacy provider of certain human resources outsourcing services, including 401(k) administrative services, originally developed by Hewitt Associates. Hewitt was acquired by Aon in 2010, and Aon spun off recordkeeping and other Hewitt service lines into Alight in 2017. After the spinoff, Alight is a private company no longer affiliated with Aon. As used herein "Alight" refers to both the current company and its predecessors.

[2] The class period is limited to the period on or after June 4, 2014, *see infra* at ¶ 43, pursuant to ERISA's six-year statute of limitations, *see* 29 U.S.C. § 1113(1).

4

§ 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34), covering all eligible current and former employees of KeyCorp and its participating subsidiaries, including Plaintiffs.

15. The Plan is a qualified plan under 26 U.S.C. § 401, commonly referred to as a "401(k) plan."

16. The Plan is maintained pursuant to a written instrument called the "Plan Document." *See* 29 U.S.C. § 1102(a).

17. From the beginning of 2014 until the end of 2018, the Plan had between 21,000 and 29,000 participants, and between $1.8 billion and $2.9 billion in assets.

### DEFENDANTS

#### *KeyCorp*

18. KeyCorp is a bank-based financial services company headquartered in Cleveland, Ohio. KeyCorp is the parent holding company for KeyBank National Association ("KeyBank"), its principal subsidiary through which most of its banking services are provided.[3] Through KeyBank and certain other subsidiaries, KeyCorp provides a range of retail and commercial banking, commercial leasing, investment management, consumer finance, student loan refinancing, commercial mortgage servicing and special servicing, and investment banking products and services to individual, corporate, and institutional clients.

19. KeyCorp is the "plan sponsor" within the meaning of 29 U.S.C. § 1002(16)(B), and

---

[3] "Capital distributions from KeyBank and other subsidiaries are [KeyCorp's] principal source of cash flows for paying dividends on [KeyCorp's] common and preferred shares, servicing [KeyCorp's] debt, and financing corporate operations." *KeyCorp Form 10-K*, at 114 (2019), *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/91576/000009157620000007/key-123119x10k.htm#sAB4F6E4F4203518A9F53D60FFF829EE1. "During 2019, KeyBank paid $1.2 billion in dividends to KeyCorp." *Id.*

has ultimate decision-making authority with respect to the Plan and the management and administration of the Plan and the Plan's investments. Because KeyCorp exercises discretionary authority or discretionary control with respect to management and administration of the Plan and disposition of Plan assets, it is a functional fiduciary under 29 U.S.C. § 1002(21)(A).

20. In addition to being the plan sponsor, KeyCorp is also specifically identified as the Administrator of the Plan in the Plan's Form 5500s filed with the United States Department of Labor ("DOL"). KeyCorp's status as Plan Administrator also renders it a fiduciary of the Plan for purposes of ERISA. *See* 29 C.F.R. § 2509.75-8 at D-3.

21. To the extent that KeyCorp has delegated any of its fiduciary functions to others, such as the Trust Oversight Committee, it maintained fiduciary responsibilities with respect to the Plan. It is well-accepted that the authority to appoint, retain, and remove other plan fiduciaries constitutes discretionary authority or control over the management or administration of the plan, and thus confers fiduciary status under 29 U.S.C. § 1002(21)(A). *See* 29 C.F.R. § 2509.75-8 (D-4); *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1465 (4th Cir. 1996) ("[T]he power … to appoint, retain and remove plan fiduciaries constitutes 'discretionary authority' over the management or administration of a plan within the meaning of § 1002(21)(A)."). Further, the responsibility for appointing and removing other fiduciaries carries with it an accompanying duty to monitor the appointed fiduciaries, and to ensure that they are complying with the terms of the Plan and ERISA's statutory standards. *See* 29 C.F.R. § 2509.75-8 (FR-17); *Coyne*, 98 F.3d at 1465 (The power to appoint and remove plan fiduciaries "carries with it a duty to monitor appropriately those subject to removal." (quotation omitted)).

22. KeyCorp possessed the ability to delegate its fiduciary responsibilities to any other person, persons, or entity. Any individual or entity not named in this Complaint to whom KeyCorp

delegated fiduciary functions or responsibilities are also fiduciaries of the Plan under 29 U.S.C. §§ 1002(21)(A) and 1105(c)(2). Because any such individuals or entities that have been delegated fiduciary responsibilities are not currently known to Plaintiffs, they are collectively named in this Complaint as John Does 1-10.

### *Trust Oversight Committee*

23. The Trust Oversight Committee is a committee designated to assist KeyCorp with administration of the Plan. The Committee has the duty to select, monitor, evaluate, and modify the Plan's investments, subject to the ultimate oversight and discretion of KeyCorp. In performance of its duties, the Committee exercises "authority or control respecting management or disposition of the Plan's assets" and is therefore a fiduciary under 29 U.S.C. § 1002(21)(A).

24. Each of the Committee members are also fiduciaries under 29 U.S.C. § 1002(21)(A). As the names of the members of the Committee during the class period are currently unknown to Plaintiffs, they are collectively named in this Complaint as John Does 11-30.

25. Each Defendant identified above as a Plan fiduciary is also subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)–(3) because it enabled other fiduciaries to commit breaches of fiduciary duties, failed to comply with 29 U.S.C. § 1104(a)(1) in the administration of its duties, and/or failed to remedy other fiduciaries' breaches of their duties, despite having knowledge of the breaches.

### **ERISA FIDUCIARY DUTIES**

26. ERISA imposes strict fiduciary duties of loyalty and prudence upon fiduciaries of retirement plans. 29 U.S.C. § 1104(a)(1) states, in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
>     (A)    for the exclusive purpose of

7

    (i)  providing benefits to participants and their beneficiaries; and

    (ii)  defraying reasonable expenses of administering the plan;

  (B)  with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims . . . .

27. These ERISA fiduciary duties are "the highest known to the law." *Chao*, 285 F.3d at 426 (quotation omitted). A fiduciary's conduct "must bear the marks of loyalty, skill, and diligence expected of an expert in the field. It is not enough to avoid misconduct, kickback schemes, and bad-faith dealings. The law expects more than good intentions. A pure heart and an empty head are not enough." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 329 (3d Cir. 2019) (quotation omitted).

## DUTY OF LOYALTY

28. The duty of loyalty requires fiduciaries to act with "an eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000); *Chao*, 285 F.3d at 426. "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Pegram*, 530 U.S. at 224 (quoting G Bogert et al., *Law of Trusts and Trustees* § 543 (rev. 2d ed. 1980)). "[A]n ERISA fiduciary must act for the exclusive purpose of providing benefits to plan beneficiaries." *Chao*, 285 F.3d at 426 (quotation omitted). "There is no balancing of interests; ERISA commands undivided loyalty to the plan participants." *Karpik v. Huntington Bancshares Inc.*, 2019 WL 7482134, at *4 (S.D. Ohio Sept. 26, 2019) (quoting *Bedrick by & Through Humrickhouse v. Travelers Ins. Co.*, 93 F.3d 149, 154 (4th Cir. 1996)).

## DUTY OF PRUDENCE

29. ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries'

8

investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). "[T]he prudent man obligation, imposes an unwavering duty to act both as a prudent person would act in a similar situation and with single-minded devotion to … plan participants and beneficiaries." *Chao*, 285 F.3d at 426 (quotation omitted)

### DUTY TO MINIMIZE COSTS

30. At retirement, employees' benefits "are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826. "Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan, by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Sweda*, 923 F.3d at 328 (quotation omitted).[4]

31. To protect retirement plan participants, ERISA requires the fiduciaries of such plans to monitor administrative expenses and ensure that they are reasonable. *See* 29 U.S.C. § 1104(a)(1)(A)(ii) ("[A] fiduciary shall discharge his duties … solely in the interest of participants … for the exclusive purpose of[] providing benefits … and defraying reasonable expenses of administering the plan[.]"); *Sweda*, 923 F.3d 3at 328 ("Fiduciaries must … understand and monitor plan expenses."). Given the significant variation in total plan costs attributable to plan size, the reasonableness of administrative expenses should be determined by comparisons to other similarly-sized plans. *See* 29 U.S.C. § 1104(a)(1)(B) (requiring ERISA fiduciaries to discharge

---

[4] The United States Securities and Exchange Commission ("SEC") and others similarly warn that although the fees and costs associated with investment products and services may seem small, over time they can have a major impact on an investor's portfolio. *See* SEC Investor Bulletin, *How Fees and Expenses Affect Your Investment Portfolio*, at 1, 3 (2014), *available at* https://www.sec.gov/investor/alerts/ib_fees_expenses.pdf.

9

their duties in the manner "that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character"); *Tussey v. ABB, Inc.*, 2007 WL 4289694, at *6, n.5 (W.D. Mo. Dec. 3, 2007) (Plaintiffs sufficiently alleged that administrative expenses were unreasonable through comparisons to similar plans because "[a]t most, reasonable compensation should mean compensation commensurate with that paid by similar plans for similar services to unaffiliated third parties.") (quoting Nell Hennessy, *Follow the Money: ERISA Plan Investments in Mutual Funds and Insurance*, 38 J. Marshall L. Rev. 867, 877 (2005)). A fiduciary may breach its fiduciary duty by authorizing higher-than-market administrative fees or by maintaining an administrative-services deal for its own benefit or that of a related party. *See Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) (affirming judgment against plan sponsor based on "overpaying" recordkeeper and benefiting from the overpayment); *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 799 (7th Cir. 2011) (failure to solicit bids, and higher-than-market recordkeeping fees, supported triable fiduciary breach claim).

### DEFENDANTS' VIOLATIONS OF ERISA

**I.  DEFENDANTS FAILED TO PROPERLY MONITOR OR CONTROL THE PLAN'S RECORDKEEPING AND RELATED ADMINISTRATIVE EXPENSES.**

32. Defendants caused Plan participants to pay excessive recordkeeping and related administrative expenses during the class period.

33. Administrative services such as recordkeeping, trustee, and custodial services are necessary for the operation of any defined contribution plan and are one of the Plan's largest expenses. Accordingly, it is important to Plan fiduciaries to closely monitor these expenses to ensure that participants are not being overcharged.

34. Typically, service providers charge for administrative services either on a per-participant fee basis (a fee based on the number of participants in the plan) or as an asset-based

fee (a fee based on a percentage of the total assets in the plan). Asset-based fee arrangements are more common for smaller defined contribution plans, which have less leverage to negotiate how services are charged. Regardless of how these fees are charged, the cost of these services is typically borne by the plan participants.

35. Among larger plans, the market for administrative services is highly competitive, with many vendors equally capable of providing a high-level service. Accordingly, vendors vigorously compete for business by offering the best price. As a result of such competition, administrative fees have declined in defined contribution plans over time. Between 2006 and 2016, recordkeeping and related administrative costs in the marketplace have dropped by approximately 50% on a per-participant basis.[5]

36. The cost of providing administrative services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating lower per-participant administrative fees. As noted above, the Plan has had between 21,000 and 29,000 participants, and between $1.8 billion and $2.9 billion in assets during the class period, making it one of the 300 largest defined contribution plans in the United States (out of more than 650,000). Accordingly, the Plan has significant leverage to negotiate administrative expenses.

37. Alight has been the Plan's recordkeeper since at least 2009.[6] KeyCorp has a close relationship with Alight. In addition to acting as the recordkeeper for the Plan, Alight also

---

[5] *See* Greg Iacurci, *Adjusting to the Squeeze of Fee Compression*, Investment News (Nov. 9, 2019) available at https://www.investmentnews.com/adjusting-to-the-squeeze-of-fee-compression-170635 ("Median fees for record-keeping, trust and custody services for DC plans fell by about half in the decade through 2017, according to most recent figures published by consulting firm NEPC. Median fees of $59 per participant in 2017 were down from $118 in 2006, when NEPC first conducted the study.").

[6] Plaintiffs currently only have access to the Plan's Form 5500s going back to 2009.

administers KeyCorp's pension plan, administers KeyCorp's retiree medical plan, and has also played an integral role in setting up and administering KeyBank's online HR portal through which all employee benefits are managed, among other things.[7] Unlike the Plan, where administrative expenses are paid by employees' assets, the costs of providing these pension plan, medical plan, and HR services are the responsibility of KeyCorp.

38. The Plan's fee disclosure provides that each eligible participant[8] is charged $63 per year for administrative services.[9] Based on Plaintiffs' investigation, a prudent and loyal fiduciary of a similarly sized plan could have obtained comparable administrative services of like quality for approximately $30-40 per participant.

39. A prudent fiduciary would have closely monitored the Plan's administrative expenses and engaged in a rigorous benchmarking analysis, either on its own or by working with an independent consultant, and would have discovered that the Plan was paying far too much for recordkeeping. Alternatively, the Plan could have performed a request for proposal ("RFP") and discovered that other service providers would have provided the same services at lower cost. These savings could have been realized through a lower per-participant monthly charge.

40. The Plan's excessive administrative expenses demonstrate that Defendants either failed to engage in prudent monitoring of the Plan's administrative expenses and engage in prudent practices to keep administrative expenses at competitive levels, or that Defendants

---

[7] KeyBank HR Online Portal, *available at* https://leplb0100.portal.hewitt.com/web/keybank/login?languageId=en_US#/routing (last visited May 4, 2020).

[8] A participant's account begins incurring the monthly administrative fee when the participant becomes eligible for matching contributions under the Plan (after one year of service).

[9] This is based on the information currently available to Plaintiffs. $63 is likely conservative. Discovery will show whether participants paid additional revenue for recordkeeping and related administrative services through indirect compensation such as revenue sharing.

12

allowed participants to be charged excessive administrative fees, such as recordkeeping, in exchange for discounts on the other services Alight was providing that KeyCorp itself should have been paying for. Either way, the process by which Defendants managed the Plan's administrative services "would have been tainted by failure of effort, competence, or loyalty," each of which constitutes a "breach of fiduciary duty." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009). Defendants' failure to monitor or control the Plan's administrative expenses cost Plan participants millions of dollars during the class period.

## II. PLAINTIFFS LACKED KNOWLEDGE OF DEFENDANTS' CONDUCT AND OTHER MATERIAL FACTS.

41. Plaintiffs did not have knowledge of all material facts (including, among other things, the cost of the Plan's recordkeeping and related administrative services compared to similarly-sized plans and the Plan's leverage to negotiate lower recordkeeping and related administrative expenses) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until shortly before this suit was filed. Further, Plaintiffs did not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan (including Defendants' processes for selecting and monitoring the Plan's recordkeeper and related administrative service providers) because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## CLASS ACTION ALLEGATIONS

42. 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to obtain for the Plan the remedies provided by 29 U.S.C. § 1109(a). Plaintiffs seek certification of this action as a class action pursuant to this

statutory provision and Fed. R. Civ. P. 23.

43. Plaintiffs assert their claims on behalf of a class of participants and beneficiaries of the Plan defined as follows:[10]

> All participants and beneficiaries of the KeyCorp 401(k) Savings Plan at any time on or after [June 4, 2014], excluding any persons with responsibility for the Plan's investment or administrative functions.

44. Numerosity: The Class is so numerous that joinder of all Class members is impracticable. The Plan had approximately 21,000-29,000 participants at all relevant times during the applicable period.

45. Typicality: Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs are Plan participants and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members with regard to the Plan. Defendants' unlawful actions and decisions affected all Plan participants similarly.

46. Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and Plaintiffs have retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

47. Commonality: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

   a. Whether Defendants are fiduciaries with respect to the Plan;

---

[10] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

    b. Whether Defendants breached their fiduciary duties by engaging in the conduct described herein;

    c. The proper form of equitable and injunctive relief; and

    d. The proper measure of monetary relief.

48. Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

49. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of prospective equitable relief by the Court would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

50. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative

litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

**COUNT I**
**Breach of Duties of Loyalty and Prudence**
**29  U.S.C. § 1104(a)(1)(A)–(B) (against all Defendants)**

51. As alleged above, Defendants are fiduciaries with respect to the Plan and are subject to ERISA's fiduciary duties.

52. 29 U.S.C. § 1104 imposes fiduciary duties of loyalty and prudence upon Defendants in connection with their administration of the Plan and the selection and monitoring of Plan investments and service providers. The scope of these fiduciary duties and responsibilities includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with appropriate care, skill, diligence, and prudence. *See* 29 U.S.C. § 1104; *Chao*, 285 F.3d at 426.

53. Defendants breached these fiduciary duties by engaging in the conduct described herein. Among other things, Defendants imprudently caused the Plan to pay excessive recordkeeping and related administrative service fees and failed to properly monitor and control those expenses. Each of the actions and omissions described above and elsewhere in this Complaint demonstrate that Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

54. Further, each of the actions and omissions described in paragraph 53 above and elsewhere in this Complaint demonstrate that Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, in violation of 29 U.S.C. § 1104(a)(1)(B).

55. As a consequence of Defendants' fiduciary breaches, the Plan and its participants suffered millions of dollars in excess fees.

56. Defendants are liable, under 29 U.S.C. §§ 1109 and 1132, to make good to the Plan all losses resulting from Defendants' fiduciary breaches. In addition, Defendants are liable for additional equitable relief and other relief as provided by ERISA and applicable law.

## COUNT II
### Failure to Monitor Fiduciaries (against KeyCorp)

57. As alleged throughout the Complaint, KeyCorp is a fiduciary of the Plan pursuant to 29 U.S.C. § 1002(21).

58. KeyCorp is responsible for appointing and removing the Committee members.

59. Given that KeyCorp had overall oversight responsibility for the Plan, and the fiduciary duty to appoint and remove members of the Committee, KeyCorp had a fiduciary responsibility to monitor the performance of the Committee.

60. A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when the monitored fiduciaries are not meeting their fiduciary obligations.

61. KeyCorp breached its fiduciary monitoring duties by, among other things:

    a. Failing to monitor and evaluate the performance of its appointees or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of its appointees' imprudent actions and omissions with respect to the Plan;

    b. Failing to monitor its appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein; and

    c. Failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessively costly recordkeeping and related administrative services to the detriment of the Plan and Plan participants' retirement savings.

62. As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses due to excessive fees.

63. Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), KeyCorp is liable to restore to the Plan all losses suffered as a result of its failure to properly monitor the Plan's fiduciaries, and subsequent failure to take prompt and effective action to rectify any observed fiduciary breaches.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Gregory Stark, William Gaff, and Michael Lewin as representative of the Class defined herein, and on behalf of the Plan, prays for relief as follows:

    A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

    B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

    C.    A declaration that Defendants have breached their fiduciary duties in the manner described in the Complaint;

D. An order compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties described herein, and to restore the Plan to the position it would have been in but for this unlawful conduct;

E. An order enjoining Defendants from any further violations of ERISA;

F. Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to review or manage the Plan and removal or replacement of Plan fiduciaries deemed to have breached their fiduciary duties;

G. An award of pre-judgment interest; and

H. An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine;

I. An award of such other and further relief as the Court deems equitable and just.

Dated: June 4, 2020

**BARKAN MEIZLISH DEROSE WENTZ MCINERNEY PEIFER, LLP**

By: /s/ Robert DeRose
Robert E. DeRose   (OH #0055214)
250 E. Broad Street, 10 Floor
Columbus, OH 43215
Telephone: (614) 221-4221
Facsimile: (614) 744-2300
bderose@barkanmeislish.com

**NICHOLS KASTER, PLLP**
Paul J. Lukas, MN Bar No. 022084X*
Kai H. Richter, MN Bar No. 0296545*
Brock J. Specht, MN Bar No. 0388343*
Grace I. Chanin, MN Bar No. 0399969*
    * *pro hac vice applications forthcoming*
4600 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
plukas@nka.com
krichter@nka.com
bspecht@nka.com

gchanin@nka.com

Counsel for Plaintiffs and the proposed Class